CHASEZ, Judge.
This is a workmen’s compensation action in which the plaintiff Willie L. Curtis brought suit against his employer, Green-Walker Galvanizing Co., Inc. and its insurer Highlands Insurance Company, for total and permanent disability compensation under the provisions of LSA-R.S. 23:1221(2). Judgment was rendered in favor of plaintiff against the defendants but limiting his recovery to compensation in the amount of $35.00 per week for a period of one hundred weeks, less a credit for compensation previously paid by defendants, upon the finding that plaintiff sustained a permanent impairment of a physical function within the contemplation of LSA-R.S. 23:1221 (4) (p). In addition plaintiff was awarded an additional 12% of the amount due and unpaid as penalty for arbitrary discontinuance of payments by the defendants, and attorney’s fees in the amount of $600.00. Expert witness fees of the two physicians who testified at trial was set at $100.00 each.
The plaintiff now takes this appeal, urging that the trial judge was in error in failing to find him totally and permanently disabled within the contemplation of the Workmen’s Compensation Act; and in awarding only $100.00 as expert witness fees to one of the testifying physicians, Dr. Richard Vincent, M.D. He asks that the judgment be amended to increase his award to $35.00 a week for a period of 400 weeks, and to increase the witness fee for Dr. Vincent to $150.00. Further he asks that his attorney fees be increased to $2,500.00, an amount he urges is commensurate with an award for total and permanent disability.
The record reflects that plaintiff was employed by Green-Walker Galvanizing Co., Inc., as a hoist or overhead lift operator when he was injured on January 3, 1967. He was standing beside an open vat of molten zinc when a piece of metal being carried on an overhead hoist accidentally fell into a vat, splashing hot molten zinc on the right side of his neck and chest causing third degree burns in both areas. He was taken immediately to the clinic of Dr. J. T. Nix where he was treated. Plaintiff remained under Dr. Nix’s care until September 24, 1967. Dr. Nix reexamined plaintiff on the day before trial •April 10, 1968.
Dr. Nix testified that plaintiff suffered a severe burn of the chest and neck which resulted in the formation of keloids, which he described as overabundant growths of tissue at the scar sites. He found plaintiff had also suffered a minor lumbosacral sprain. Dr. Nix stated that as a result of the heavy scar and tissue formation on the right side of plaintiff’s neck, plaintiff had a head rotation restriction to the left of approximately 20 per cent. In describing this restriction Dr. Nix stated that while the average person can rotate his head ninety degrees to the left, plaintiff can now rotate his head to the left *825 approximately 18 degrees less than average, or 72%. Dr. Nix testified that plaintiff had no restriction in turning his head to the right, or up or down.
Additionally Dr. Nix testified that plaintiff suffered a painful scar syndrome in the area of the keloid formation. He stated the pain is worse on light pressure than on deep pressure. He was of the opinion that the pain syndrome had decreased by the time of the trial but that he didn’t “think it has gone away completely.”
Dr. Nix was of the opinion that plaintiff could do heavy manual labor so long as he did not have to use extreme range of motion of his neck or extreme bending of his back.
On the advice of Dr. Nix plaintiff also sought the treatment of Dr. Richard Vincent, a plastic surgeon, in May, 1967. Dr. Vincent was more specific as to the description of the scarred area. He read and commented on a portion of his medical report which he had prepared June 30, 1967 as follows:
“A. I measured the scars at the time and—
“Q. I refer you, Doctor, to the report of June 30, 1967.
“A. —and reported as follows: There is a rather extensive scarring on the right side of the patient’s neck from the hair line in the postauricular region downward almost to the clavicle or the collar bone. Several irregular linear scars run together. The longest of these scars is about thirteen cenumeters in length. It is elevated. It is dark and shiny.
“There is another element at least eight centimeters in length. There are some areas which are dark and shiny, elevated, and an anterior scar which is six centimeters in length.
“Above this in the postauricular region are two other areas of irregular scarring approximately one by three and one by two centimeters in this area.
“Examination of the chest reveals several spotted areas of scarring. These are smaller to the left of the midline. The largest of these is three centimeters in length and about a centimeter in width.
“He has a scar over the left side of the chest extending from the nipple down to the midline as a result of a laceration. The vaccination scar is slightly elevated and I made my diagnosis at that time as scarring with a hypertrophied scar, possibly keloid formation, right side of the neck, secondary to thermal burns from hot zinc.”
He stated that he was hesitant to undertake any surgery as the scar is rather large and would require skin grafting and skin grafting in that area would show a tendency to shrink.
He was of the opinion that plaintiff does have a disability but he found it difficult to assign percentages to it. This disability involved a limitation of neck rotation. He was of the opinion that this limitation would be in more than one direction, though it was slight. When asked if he was of the opinion that plaintiff could not return to his former occupation, Dr. Vincent stated:
“A. Let me see, I tell you what I’m getting at. I honestly believe that his limitation would come in looking up. If the limitation that would exist, I think, in my opinion, he may not be able to look as high. I don’t know how high he looks up, I don’t know what the angle would be and I don’t know anything else and he might — I don’t know how far he has to look to one side or the other, but I don’t know that I can say whether or not that would. I’m not even sure if I went out there and watched him run that crane, if I could answer that question, but I would say that there is a possibility that he *826 might have limitations enough that he might have trouble looking like this.
(Witness indicating.)
“That would be my guess, as much as my other one, that if he had to look up he would get in trouble.”
Plaintiff testified at length as to the nature of his duties as an overhead lift operator. From this testimony and from the testimony of Mr. Hubert Adams foreman on the job when plaintiff was injured, we conclude that plaintiff’s job consisted mainly of guiding an overhead hoist across a track approximately 22 feet from the ground by means of a system of pulley ropes and levers. The ropes and levers are at body level and the material carried by the hoist usually eight to ten feet from the ground.
Plaintiff contends that he is unable to return to his former occupation thus is totally and permanently disabled within the contemplation of LSA-R.S. 23:1221(2). He argues that his duties require that he have full and unrestricted movement of his neck and head in all directions to insure the safety of himself and his fellow employees, in that the lifting, hauling and dipping procedure is a dangerous one and requires a constant lookout in all directions, including upward. Further he argues that the scar area on his neck is overly sensitive to pain and he could not wear the protective clothing which he feels is necessary to insure his own safety under the prevalent working conditions.
The trial judge in his excellent reasons for judgment summed up the testimony of the medical experts and other evidence and testimony offered at the trial. He concluded :
“While there is some evidence of a residual disability of a permanent character, the Court finds an absence of sufficient, probative evidence to sustain plaintiff’s burden of proof of total and permanent disability. In fact, the evidence seems to preponderate the conclusion that plaintiff has sustained a permanent impairment of a physical function.”
We agree with these statements and find that they represent an accurate solution to the question presented herein.
Plaintiff certainly has shown that he has suffered a permanent impairment of a physical function due to a work connected injury and thus is entitled to workmen’s compensation benefits. However to be entitled to the benefits of LSA-R.S. 23:1221(2), for a total and permanent disability, it was encumbent upon him to prove that this disability rendered him unable to do work of any reasonable character. It is in this respect that plaintiff’s case is lacking. The record simply fails to establish that plaintiff is unable to return to his prior occupation as an overhead crane operator. There is some testimony, particularly that of Dr. Vincent, that plaintiff suffers minor limitation in his ability to turn his head upward. We do not feel that this testimony alone is sufficient to establish that plaintiff could not do the work of an overhead crane operator even though the job entails the necessity to keep a close lookout on an overhead crane some 22 feet off the ground.
There is evidence that plaintiff’s job requires him to wear protective clothing to protect himself from splashing molten metal, and the medical testimony shows that the scarred area on plaintiff’s neck was sensitive to light pressure from clothing. However this evidence is not sufficient to establish that this sensitivity is substantial pain with which the jurisprudence hold a man is not required to work.
After a close evaluation of the record before us we are convinced that this case is clearly a situation which calls for the application of LSA-R.S. 23:1221 (4) (p) as the trial judge so held, and does not fall with the contemplation of LSA-R.S. 23:1221(2).
*827 As we will not disturb the 100 week award of $35.00 per week to plaintiff, neither will we disturb the $600.00 award to him for legal fees as the $600.00 sum is commensurate with the compensation awarded.
Finally we consider plaintiff’s specification of error regarding the award of $100.00 to Dr. Vincent as an expert witness fee. We find tfye. jurisprudence is well settled to the effect that the matter of setting the amount of such fees is within the discretion of the trial judge. LSA-R.S. 13:3666; Coiné v. Smith, 100 So.2d 902, La.App. 1 Cir. 1958. We can find no basis to decide that he has abused this discretion in fixing Dr. Vincent’s fee at $100.00 in this case, thus we will allow the figure to remain unchanged.
For the reasons hereinabove discussed the decision of the trial judge is affirmed at appellant’s cost.
Affirmed.